*Todd Arthur Robson v. State of Maryland*, No. 0764, September Term 2022, Opinion by Moylan, J.

**HEADNOTES:**

**CONSIDERATIONS AT A SENTENCING PROCEDURE – THE CONTENTIONS – THE FACTUAL CASE – THE VERDICTS AND THE SENTENCING – THE SENTENCING ISSUE – APPELLANT'S ARGUMENT DOES NOT LOGICALLY FOLLOW – THE LOGICAL FALLACY OF A SURMISED NON-FINDING – THE NON-PROOF OF "A" IS NOT PROOF OF "NON-A" – DOES WHAT THE JURY BELIEVED EVEN MATTER? – THE SUPREME COURT AND THE DEEP BACKGROUND – MARYLAND HAS TRADITIONALLY FOLLOWED SUIT – WHAT SENTENCES DOES MARYLAND FORBID? – THE SENTENCE HERE WAS NOT CRUEL AND UNUSUAL – THE SENTENCE HERE DID NOT EXCEED THE STATUTORY MAXIMUM – THE SENTENCE MAY NOT BE MOTIVATED BY ILL-WILL, PREJUDICE, OR OTHER IMPERMISSIBLE CONSIDERATIONS – A SENTENCING JUDGE MAY CONSIDER EVIDENCE WHICH WAS NOT PART OF THE TRIAL – A SENTENCING JUDGE MAY CONSIDER CONDUCT OF WHICH A DEFENDANT HAS BEEN ACQUITTED – A SENTENCING JUDGE MAY CONSIDER EVIDENCE UNCONSTITUTIONALLY OBTAINED – WHAT IS AN IMPERMISSIBLE CONSIDERATION? – WHAT IS RELIABILITY? – THE SENTENCING PROCEDURE IN THIS CASE – THE GRAMMATICAL SIN OF**

**THE COMPOUND QUESTION – SOME SYNTACTICAL HOMEWORK – THE BASIC PURPOSE OF <u>VOIR DIRE</u> – WHAT MYSTERIES MAY LIE HIDDEN BENEATH A COMPOUND QUESTION – TWO GENERAL RULES – A REPRESENTATIVE EXAMPLE – NON-PRESERVATION SQUARED – THE PRIME PURPOSE OF THE PRESERVATION REQUIREMENT – THE INVITED ERROR DOCTRINE – INEFFECTIVE ASSISTANCE OF COUNSEL – A SHOTGUN IN THE JURY ROOM? – JEOPARDY OF LIFE – JEOPARDY OF LIMB – A MATTER OF DISCRETION**

Circuit Court for Howard County
Case No. C-13-CR-20-000567

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 0764

September Term, 2022

_____

TODD ARTHUR ROBSON

v.

STATE OF MARYLAND

_____

Ripken,
Albright,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

Concurring Opinion by Albright, J.
_____

Filed:  March 8, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

Is the sentencing procedure a part of the trial? The answer to that may well be, "Yes and no." It all depends upon what one means by the term "trial." Is it what the term literally and narrowly denotes or is it what the term more broadly connotes? The term "trial" may describe an extended judicial proceeding, from the filing of criminal charges through the imposition of a punitive sanction. Such a description embraces not only the core proceeding but the entire hinterland of that core proceeding. In that broad sense, the sentencing procedure is, indeed, a part of the trial.

The term "trial" may, on the other hand, be limited austerely to the core adjudicative determination itself whereat a qualified factfinder (judge or jury) resolves the single issue of whether a criminal defendant is literally guilty or not guilty of the crime charged. Its exclusive focus is on the disputed facts of the case. That determination is not concerned with any anterior question of whether charges should have been brought or whether the defendant was properly arraigned. Nor is it concerned with any posterior question of whether a sanction should be imposed or how a new trial motion should be resolved. Those are pre-trial and post-trial phenomena. In that core sense of "trial," the sentencing procedure is not a part of the trial. It is a post-trial event.

This distinction between narrow and broad definitions of the term "trial" may frequently be dispositive of an appeal, because there are numerous and mandatory constraints and restrictions limiting what may be considered within the core heartland of the "trial" of guilt or innocence that do not inhibit decision-making in the more sweeping hinterland of the larger "trial" process. Evidentiary admissibility in the hinterland is not necessarily, and frequently is not, evidentiary admissibility in the heartland. Conversely,

evidentiary inadmissibility in the heartland does not necessarily mandate inadmissibility in the hinterland. Evidence which might be strictly forbidden in the heartland may be freely acceptable in the more latitudinarian hinterland. This distinction may make all the difference. In this case, it does. The sentencing procedure being challenged took place only in the hinterland. The Hinterland Rules therefore apply.

## The Contentions

The appellant, Arthur Robson, was convicted in the Circuit Court for Howard County by a jury, presided over by Judge Quincy Coleman, of Reckless Endangerment. Upon this appeal, the appellant raises the following three contentions, which we have reordered in terms of, in our judgment, their relative significance:

1. **That Judge Coleman erroneously relied on an impermissible consideration when sentencing the appellant;**

2. **That Judge Coleman erroneously asked compound <u>voir dire</u> questions in a manner that allowed individual jurors to determine for themselves whether they would be prejudicially biased; and**

3. **That Judge Coleman erroneously refused to allow an unloaded shotgun which had been entered into evidence to go into the jury room during the jury's deliberations.**

## The Factual Case

On the evening of November 6, 2020, at approximately 9:00 P.M., Sheriff's Deputies Stephen Merle and Paola Sanchez set out to serve a peace order on the appellant at his home in Howard County. The appellant lived in a basement apartment near the back of a large house at the far end of a very long driveway. The deputies were in full uniform. They exited their car and began walking toward the house, where all interior lights were

turned off and no porch lights were lit. As they moved around toward the rear of the house, Deputy Merle saw a large picture window in the basement with all of the interior lights turned on. That turned out to be the appellant's basement apartment.

Deputy Merle approached the door and knocked "very loudly." Deputy Sanchez stayed behind, near a fence. When no one answered, Deputy Merle knocked again, twice and very loudly. As Deputy Sanchez was looking into the picture window she informed Deputy Merle that someone was coming to the door.

Deputy Merle testified that when the door opened, "the next thing I saw was a shotgun pointed at my face." The appellant was described as holding the shotgun approximately 18 to 32 inches from the deputy's face. Deputy Merle grabbed his microphone to radio for help and yelled into the radio, "Sheriff 430. Gun." At the same time, Deputy Merle managed to unholster his own gun. He yelled at the appellant three times to "Drop the gun." The shotgun was still "pointed at my head." When the deputy then yelled, "Drop the shotgun or I'm going to fucking kill you," the appellant put the shotgun down. Deputy Merle ordered the appellant to lie on the floor and the deputy handcuffed him. By that time, other officers had arrived on the scene and assisted in arresting the appellant. Throughout the arrest process, the appellant kept asking, "What did I do?"

On cross-examination, Deputy Merle was asked precisely how the shotgun was being held by the appellant. He replied that the stock of the gun was on the appellant's right shoulder while the appellant's left hand was on the barrel. In his report written later that night, the deputy wrote that when the appellant came to the door, he pointed the shotgun at

3

the deputy's chest. In his testimony, however, the deputy insisted that the gun was pointed at his face. In terms of Reckless Endangerment, of course, that is a distinction without a difference.

Deputy Sanchez, for her part, testified that when she heard the knock at the door, she saw the appellant walking toward the door while talking on a cell phone. A moment later, she heard Deputy Merle yell, "Whoa, gun." She drew her own gun and followed Deputy Merle into the house, just as the appellant was being arrested. She never actually saw the shotgun aimed at Deputy Merle but she did see the appellant put the gun down after Deputy Merle drew his own weapon. Deputy Sanchez also testified that she thought that the appellant was "probably intoxicated" because his speech was a "little slurred."

The appellant testified in his own defense. He testified that the shotgun was near the door because he had been using it the day before to shoot squirrels. On the evening of November 6, a very dark night, he was in bed talking on his cell phone when he heard a loud knocking at the door. He had just moved into the area and only knew three people who lived there. As he walked toward the door, he was nervous because, "I'm in the middle of nowhere and I don't know anybody and somebody's trying to get in my door." He testified that he picked up the shotgun that was leaning against the door jamb, unlocked the deadbolt, opened the door with his right hand but kept the gun pointed toward the floor. He also admitted that he had had a couple of drinks that night of Jim Beam.[1]

---

[1]     Simply as an aspect of Reckless Endangerment, handling a loaded shotgun in a confrontational situation while even slightly intoxicated could add a discernible dimension to the degree of recklessness. At sentencing it was a serious consideration. As Judge Coleman observed:

4

On the three-count indictment, the jury acquitted the appellant of First-Degree Assault, was hung with respect to the charge of Second-Degree Assault, but convicted the appellant of Reckless Endangerment.

## The Verdicts And The Sentencing

The assaultive behavior of the appellant in this case lasted, at most, for a minute or two. The appellant's criminal behavior consisted essentially of his response to a knock at his door. At the sentencing hearing, the State characterized what it deemed to be the significance of the appellant's behavior:

> Mr. Robson does not have any record, but <u>the State is obviously concerned [about] the issue of bringing a firearm to the door when answering it</u>.

(Emphasis supplied.)

The critical confrontation began as the appellant, who may have been at least slightly intoxicated, picked up a loaded shotgun as he prepared to open the door. It culminated in the way in which he pointed the shotgun, so that it was pointed in some fashion at the upper body of the person seeking entrance to the house. It lasted until the appellant was persuaded to put the gun down and to lie down on the floor.

---

> <u>Who greets people at a door with a shotgun? That could have turned into something tragic</u>. There were two sheriffs. And <u>there was evidence that you were under the influence of alcohol</u>. There were pictures showing that you had consumed or showed that there was a trashcan full of empty beer cans and a fifth I believe it was Jim Beam alcohol and most of it was consumed…[T]<u>his Court is not going to tolerate anyone</u>, I don't care who it is, <u>pointing firearms, shotguns, or whatever. This Court is not going to tolerate that</u>.

(Emphasis supplied.)

5

In that brief encounter, every small detail had potentially great significance, both for the jury in determining guilt and for Judge Coleman's determination of an appropriate sentence. On the charge of First-Degree Assault, the jury acquitted the appellant. On the charge of Second-Degree Assault, the jury failed to agree on a verdict and was hung. On the charge of Reckless Endangerment, the jury convicted the appellant, finding that the appellant's conduct had, indeed, recklessly endangered Deputy Merle.

With respect to the verdicts, it could plausibly be argued that the appellant got a bit of a break. The mixed verdicts were certainly less Draconic than they could have been. The defense argued for a disposition of Probation Before Judgment. The Presentence Report, albeit of the opinion that some penalty was appropriate, indicated that it would have been content with a sentence so structured that the appellant could have served his time on weekends, even suggesting that three weekends might have been adequate. The State, for its part, seemed to indicate that it would have been satisfied with a sentence for Reckless Endangerment of five years but with all but thirty days suspended followed by a period of probation.

Judge Coleman, on the other hand, took a decidedly sterner approach, based especially on the way in which the appellant had wielded and pointed the shotgun:

> You know, I listened to that trial and <u>I listened to Deputy Sheriff Merle testify</u> when he was executing that Peace Order. And he <u>basically testified that he knocked on the door and it was at nighttime and you greeted him with a shotgun and pointed it at his face</u>. And when he was explaining that to this Court and to the jury, his voice went up as if he was still under the stress of that event.
>
> We live in a civil society and these deputies carry out an important function of this Court. And <u>at the time that they were serving that Peace Order, they have a right to go home to their family. Who greets people at a door with a shotgun? That could</u>

have turned into something tragic. There were two sheriffs. And there was evidence that you were under the influence of alcohol. There were pictures showing that you had consumed or showed that there was a trashcan full of empty beer cans and a fifth. I believe it was Jim Beam alcohol and most of it was consumed.

Sir, again, these sheriffs have a right to go home to their families. And this Court is not going to tolerate anyone, I don't care who it is, pointing firearms, shotguns, or whatever. This Court is not going to tolerate that. As such, sir, it is the position of this Court that this Court sentence you to a period of five years in the Department of Corrections, suspend all but two. Three years' probation upon release. Once you're released, you'll be ordered to undergo alcohol treatment. Probation fees are waived in this case. Court costs are waived in this case. That is the sentence of this Court.

(Emphasis supplied.) That sentence, of course, is at the very heart of the appellant's first contention. Was the judge legally permitted to sentence as he did?

## The Sentencing Issue

Defense counsel lodged an immediate objection to the sentence. Battle over what became the ultimate legal issue in this case was immediately joined:

DEFENSE COUNSEL: You indicated that the evidence showed that he answered the door and pointed the weapon at the deputy's face. Had that been what the jury concluded, he would have been found guilty of first- or second-degree assault, most likely both. I believe it's inappropriate, Your Honor, for the Court to take that into consideration I gather so very heavily when rendering a sentence when that is not, in fact, what the jury concluded.

(Emphasis supplied.)

Counsel argued that Judge Coleman had erroneously concluded that the appellant had "pointed the weapon at the deputy's face." Counsel argued that that was not what "the jury concluded" because, had it done so, the appellant "would have been found guilty of first- or second-degree assault." The heart of the appellant's legal argument then followed: "[I]t is inappropriate to take into consideration [a fact] when that is not what the jury

7

concluded." The sentencing judge, the argument holds, is constrained by the jury's factfinding, actual or surmised. The defense offered, however, not a scintilla of authority in support of so bold a legal assertion. Is it, indeed, inappropriate for the sentencing judge to sentence as he did?

**Appellant's Argument Does Not Logically Follow**

The appellant's argument that the verdicts established that the jury must have found that the appellant did not point the shotgun at Deputy Merle's face or head does not necessarily follow, however, from the verdict of not guilty of First-Degree Assault. As Maryland Code, Criminal Law Article, Sect. 3-202(b) expressly provides, the crime of First-Degree Assault requires a <u>mens rea</u> of intending "to cause serious physical injury to another." The jury might well have rejected the <u>mens rea</u> of intending "serious physical injury" notwithstanding having found the <u>actus reus</u> of pointing the shotgun at the deputy's head or face. With respect to that <u>actus reus</u>, we do not know what the jury concluded. The non-finding on which the appellant surmises and relies was not a logical conclusion from the verdict.

Our same rejection of the logic of the appellant's argument holds true with respect to the appellant's theory that the hung jury as to Second-Degree Assault proved that the jury must have rejected the <u>actus reus</u> of pointing the shotgun at the deputy's face or head. As Criminal Law Article, Sect. 3-203(c)(2)(i) clearly provides, Second-Degree Assault punishes the <u>mens rea</u> plus the scienter of "intentionally caus[ing] physical injury to another if the person knows or has reason to know that the other is a law enforcement officer engaged in the performance of the officer's official duties." A hung jury could easily

8

have resulted from uncertainty about the <u>mens rea</u> or from uncertainty about the sciencter of awareness of the deputy's official status without any conclusion having been reached about the <u>actus reus</u> of pointing the shotgun at the deputy's head.

### The Logical Fallacy Of A Surmised Non-Finding

Although the appellant's argument in this regard is ultimately unavailing, it is nonetheless intriguing. It is a clever but insidious type of argument that occurs with vexatious frequency. It is an argument that exploits the logical fallacy of a surmised non-finding. "The jury, we surmise, did not find A, because the jury, we further surmise, would not have rendered the verdicts it did, if it had found A." Is that being proffered as a cognizable syllogism? In this case, a spurious major premise was actually constructed on that surmised non-finding by the jury, a non-finding that the appellant ever pointed the shotgun at the face or head of Deputy Merle. "<u>Ergo</u>, such a deadly pointing must never have occurred and the sentencing judge should not have considered it as if it had occurred."

### The Non-Proof Of "A" Is Not Proof Of "Non-A"

Is a non-finding, however, even a cognizable playing piece on the adjudicative chessboard? What degree of certitude, if any, is necessary to support a non-finding? Is there even such a cognizable legal issue as the required evidentiary support for a non-finding? Is there a difference between a strong non-finding and a weak non-finding? In a jury trial, moreover, should not a non-finding be unanimous? Non-findings, even when they exist, are randomly evanescent. A non-finding may be nothing more than a nagging sense of doubt in the mind of a single juror. How then would that become a finding by the jury? The only sure rule that one can extract from this welter of illogic is this: The non-proof of

9

"A," however one discerns non-proof, is absolutely not proof of "non-A." Uncertainty with respect to the affirmative is not tantamount to reverse certainty with respect to the negative. A non-finding of the affirmative is not a finding of the negative. A non-finding that the threatening pointing at the deputy's head did occur is not a finding that the threatening pointing did not occur. The world is more than binary. Many an argument, however, is built on just so insubstantial a foundation.

### Does What The Jury Believed Even Matter?

But even if we knew what, if anything, the jury may have concluded in this regard, need we care? Our rejection of the logic of the appellant's argument in microcosm is completely superfluous to our rejection of the appellant's legal contention in macrocosm. Even if Judge Coleman's conclusion with respect to the <u>actus reus</u> of pointing the shotgun at Deputy Merle's head had been diametrically different from the conclusion, if any, of the jury in that regard, that would not in any way have inhibited the discretion of Judge Coleman in making his own independent decision as to an appropriate sentence.

Judge Coleman rejoined, moreover, that he had heard exactly the same credible evidence that the jury had heard and that the considerations that guided his sentencing were properly based upon "that testimony:"

> THE COURT: Well, that's fine, sir. But <u>the evidence that this Court heard, too</u>, and whether the Court found him guilty of first-degree assault, <u>the fact of the matter is that there was a shotgun, according to the testimony, pointed [at] Deputy Merle. This Court heard that testimony</u>.

(Emphasis supplied.)

10

That is the question. Is the sentencing judge simply the punitive arm of the jury? Or is the sentencing judge an independent actor with an independent mission? At this point it will behoove us to take a long step backward and look at our problem in historic perspective.

## The Supreme Court
## And The Deep Background

Supreme Court Justice Hugo Black was an eminent historian of Anglo-American common law. In <u>Williams v. New York</u>, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), he wrote for the Supreme Court in stating unequivocally that the procedural and evidentiary strictures imposed on the finding of guilt or non-guilt do not inhibit the sentencing judge in his discretionary determination of an appropriate sentence:

> <u>Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment</u> to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently, and of course <u>in the smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders</u>.

337 U.S. at 246. (Emphasis supplied.)

The distinction between the constraints imposed on the determination of guilty or not guilty and the broad discretionary latitude permitted a sentencing judge is based upon more than history:

> <u>In addition to the historical basis for different evidentiary rules governing trial and sentencing procedures</u> there are sound practical reasons for the distinction. In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. <u>Rules of evidence have</u>

11

been fashioned for criminal trials which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged. These rules rest in part on a necessity to prevent a time consuming and confusing trial of collateral issues. They were also designed to prevent tribunals concerned solely with the issue of guilt of a particular offense from being influenced to convict for that offense by evidence that the defendant had habitually engaged in other misconduct.

337 U.S. at 246-47. (Emphasis supplied.)

The Supreme Court expressly rejected any effort to impose on the sentencing judge the "restrictive rules of evidence properly applicable to the trial:"

A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant – if not essential – to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.

337 U.S. at 247. (Emphasis supplied.)

The conclusion was sure that sentencing procedure was not restricted by trial procedure:

[W]e do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts – state and federal – from making progressive efforts to improve the administration of criminal justice.

337 U.S. at 251. (Emphasis supplied.) Sentencing procedure is not to be inhibited by trial procedure.

In Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), a defendant objected that at his sentencing, he had been subjected to a violation

12

of his constitutional right of confrontation. Justice Cardozo wrote for the Court in pointing out that the right to confrontation, though assuredly present at a trial for guilty or not guilty, is not applicable at a sentencing proceeding:

> The underlying principle gains point and precision from <u>the distinction everywhere drawn between proceedings at the trial and those before and after</u>. <u>Many motions before trial are heard in the defendant's absence, and many motions after trial or in the prosecution of appeals</u>. Confusion of thought will result if we fail to mark the distinction between requirements in respect of presence that have their source in the common law, and requirements that have their source, either expressly or by implication in the Federal Constitution.

291 U.S. at 107. (Emphasis supplied.)

## Maryland Has Traditionally Followed Suit

Maryland has consistently followed the lead of the common law generally and of the Supreme Court of the United States specifically in recognizing that the procedural regulations and evidentiary restrictions governing the trial of guilt or innocence do not automatically apply to a criminal sentence or to its antecedent sentencing procedure. In <u>Bartholomey v. State</u>, 267 Md. 175, 193, 297 A.2d 696 (1972), Chief Judge Robert C. Murphy of the Court of Appeals articulately set out the Maryland philosophy on sentencing, a philosophy indistinguishable from that laid out by Justices Black and Cardozo for the Supreme Court of the United States:

> [T]he sentencing judge may inquire into the past criminal record of the defendant and hear evidence and receive reports in aggravation or mitigation of punishment; <u>the inquiry of the judge is not limited by the strict rules of evidence</u> and he is invested with wide discretion in determining the sentence to be imposed within the authorized statutory limits. [T]o aid the sentencing judge in fairly and intelligently exercising the discretion vested in him, <u>the procedural policy of the State encourages him to consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any</u>

13

other matters that a judge ought to have before him in determining the sentence that should be imposed.

(Internal citations omitted.) (Emphasis supplied.)

In Johnson v. State, 274 Md. 536, 540, 336 A.2d 113 (1975), the Court of Appeals spoke to a similar effect:

[T]he objectives of the sentencing judge encompass: punishment, deterrence and rehabilitation. In order to impose what is necessary to accomplish these ends, he has a very broad latitude, confined only by unwarranted and impermissible information, to consider whatever he has learned about the defendant and the crime. Such perceptions can be derived from the evidence presented at the trial, the demeanor and veracity of the defendant gleaned from his various court appearances, as well as the data acquired from such other sources as the presentence investigation or any person knowledge the judge may have gained from living in the same community as the offender.

(Emphasis supplied.)

In Poe v. State, 341 Md. 523, 532, 671 A.2d 501 (1996), Judge Chasanow wrote for the Court:

A judge should fashion a sentence based upon the facts and circumstances of the crime committed and the background of the defendant, including his or her reputation, prior offenses, health, habits, mental and moral propensities, and social background. [A] trial judge may base the sentence on perceptions derived from the evidence presented at the trial, the demeanor and veracity of the defendant gleaned from his various court appearances, as well as the data acquired from such other sources as the presentence investigation or any personal knowledge the judge may have gained from living in the same community as the offender. A trial judge's discretion is limited only by constitutional standards and statutory limits. The ultimate determination must not be motivated by ill-will, prejudice, or other impermissible considerations.

(Internal citations omitted.) (Emphasis supplied.)

## What Sentences Does Maryland Forbid?

14

The sentencing procedure in Maryland has its own independent body of rules and regulations. That set of regulations, moreover, is a very limited one. In 1984, Chief Judge Murphy wrote the opinion in <u>Teasley v. State</u>, 298 Md. 364, 470 A.2d 337, in which the Court of Appeals set out that full panoply of rules and regulations:

> <u>Appellate review of sentences is extremely limited in Maryland</u>; <u>only three grounds of review are recognized</u>: (1) <u>the sentence may not constitute cruel and unusual punishment or otherwise violate constitutional requirements</u>; (2) <u>the sentencing judge may not be motivated by ill-will, prejudice or other impermissible considerations</u>; and (3) <u>the sentence must be within the statutory limitations</u>.

298 Md. at 370. (Emphasis supplied.)

In the <u>Teasley</u> case itself, the complaint challenging the sentence had been that the sentencing judge had failed to apply or had misapplied the Sentencing Guidelines. That failure, if applicable, did not constitute a cognizable ground for review under Maryland law:

> <u>Nor is it an impermissible consideration</u>, within the contemplation of our cases, <u>for a trial judge not to apply the Guidelines, or to apply them improperly</u>.

298 Md. at 370-71. (Emphasis supplied.) The Sentencing Guidelines are only guidelines. *See also* <u>Bartholomey v. State</u>, 267 Md. 175, 193, 297 A.2d 696 (1972); <u>State v. Dopkowski</u>, 325 Md. 671, 680, 602 A.2d 1185 (1992).

Beyond these three prohibitions, what a sentencing judge may consider is open-ended. As Chief Judge Murphy wrote for the Court in <u>Smith v. State</u>, 308 Md. 162, 166, 517 A.2d 1081 (1986), "The strict rules of evidence do not apply at a sentencing proceeding."

**The Sentence Here Was Not Cruel And Unusual**

The first of the three grounds for appellate review of a sentence in Maryland is whether the sentence was constitutionally cruel and unusual pursuant to Article 25 of the Maryland Declaration of Rights or the Eighth Amendment of the United States Constitution. *See* <u>Robinson v. California</u>, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). (The Eighth Amendment prohibition of cruel and unusual punishment applies to the states through the Due Process Clause of the Fourteenth Amendment.) There was no such claim made in this case, nor could there have been. In no way could the sentence in this case of five years of imprisonment with all but two years suspended for the crime of Reckless Endangerment be deemed cruel and unusual.

## The Sentence Here Did Not Exceed The Statutory Maximum

For his conviction for Reckless Endangerment, the appellant received a sentence of five years of imprisonment with all but two years suspended, followed by a period of probation for three years. For the crime of Reckless Endangerment, Maryland Code, Criminal Justice Article, Sect. 3-204(b) provides the following punishment:

> <u>A person who violates this section</u> is guilty of the misdemeanor of reckless endangerment and on conviction <u>is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both</u>.

(Emphasis supplied.) The sentence in this case did not exceed that statutory limit.

## The Sentence May Not Be Motivated
## By Ill-Will, Prejudice, or Other Impermissible Considerations

The third and final inquiry for appellate review of a sentence or sentencing procedure in Maryland is whether the sentencing judge was motivated by ill-will, prejudice, or other impermissible considerations. This inquiry is open-ended and occasions

16

an examination of <u>Logan v. State</u>, 289 Md. 460, 425 A.2d 632 (1981), the leading Maryland appellate opinion on the subject of sentencing and sentencing procedure. At the very outset of the sentencing discussion, Judge Digges reaffirmed the broad latitude enjoyed by a sentencing judge in Maryland:

> The petitioner does not dispute, as clearly he cannot, that <u>in this State a sentencing judge is vested with virtually boundless discretion</u>. <u>He may impose any sentence,</u> which is not cruel and unusual punishment proscribed by Article 16 of the Maryland Declaration of Rights, and which is within the statutorily imposed limitations (if any there be), <u>determined to be deserved for or necessitated by the proven criminal conduct in question</u>. In the pursuit of this indispensable but often perplexing duty, <u>a broad range of information may be mustered by the judge as an aid to his determination</u>.

289 Md. at 480. (Emphasis supplied.) We begin our examination of what may be an impermissible consideration by noting what are not impermissible considerations.

## A Sentencing Judge May Consider
## Evidence Which Was Not Part Of The Trial

<u>Logan v. State</u> is, indeed, a treasure trove of factors which a sentencing judge is free to consider although fastidious defense counsel will instinctively opt to challenge such factors. Subject only to the qualification that the evidence be reliable, a sentencing judge is free to consider questionable conduct on the part of a defendant which has never been charged against him and for which he has never been tried:

> In considering what is proper punishment, <u>it is now well-settled in this State that a judge is not limited to reviewing past conduct whose occurrence has been judicially established, but may view reliable evidence of conduct which may be opprobrious although not criminal, as well as details and circumstances of criminal conduct for which the person has not been tried</u>.

289 Md. at 481. (Emphasis supplied.) *See also* <u>Henry v. State</u>, 273 Md. 131, 147-48, 328 A.2d 293 (1974).

## A Sentencing Judge May Consider
## Conduct Of Which A Defendant Has Been Acquitted

A sentencing judge's latitude is broader than that. The sentencing judge may consider conduct for which the defendant has been tried and actually acquitted:

> Indeed, <u>since an acquittal does not necessarily establish the untruth of all evidence introduced at the trial of the defendant, the sentencing judge also may properly consider reliable evidence concerning the details and circumstances surrounding a criminal charge of which a person has been acquitted</u>.

<u>Id.</u> (Emphasis supplied.) *See also* <u>Henry v. State</u>, 273 Md. at 150 ("In passing sentence the trial judge was not required to remain oblivious to evidence of Henry's involvement in the homicide and robbery at a level less than would warrant his conviction of those crimes."); <u>Dillsworth v. State</u>, 308 Md. 354, 368 n.4, 519 A.2d 1269 (1987) ("[I]t is proper for a sentencing judge to consider reliable evidence of the details and circumstances surrounding a criminal charge of which a defendant has been acquitted."); <u>Curry v. State</u>, 60 Md. App. 171, 183-84, 481 A.2d 812 (1984); <u>Johnson v. State</u>, 75 Md. App. 621, 642, 542 A.2d 429 (1988).

## A Sentencing Judge May Consider
## Evidence Unconstitutionally Obtained

Even illegally obtained or unconstitutionally obtained evidence may be factually reliable. A weapon or a drug, for instance, seized from a defendant will be factually reliable whether the Fourth Amendment was violated or not. In the <u>Logan</u> case itself, for instance, the sentencing judge considered confessions to "six other housebreakings" in a case where all six confessions "were unconstitutionally obtained as a result of the display to petitioner

18

of an illegally seized set of master keys." With respect to that evidence, the Logan opinion, 289 Md. at 480, noted:

> It was conceded by the State at trial, as it was before this Court, that the confessions to the six other housebreakings, to which Judge Fisher referred, were unconstitutionally obtained as a result of the display to petitioner of an illegally seized set of master keys.

(Emphasis supplied.) Despite the defendant's protest, the Court of Appeals did not buy the argument:

> Logan urges this Court to vacate the sentence imposed because, in his view, with the absence here of any of the well-recognized exceptions, the rule requiring exclusion of any unconstitutionally obtained evidence applies to sentencing proceedings, it being a part of the trial; thus, he posits that Judge Fisher committed reversible error by giving such illegally obtained confessions any consideration whatsoever. We do not agree.

289 Md. at 480. (Emphasis supplied.)

The Logan opinion cited both United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) and Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) for the proposition that "most illegally-obtained evidence…is not inherently unreliable." 289 Md. at 485. The Logan opinion, 289 Md. at 485-86, then went on to quote Judge Harrison Winter of the Fourth Circuit Court of Appeals in United States v. Lee, 540 F.2d 1205, 1211 (1976) to the effect that the Exclusionary Rule has as its purpose only compliance with the constitution and not the accuracy of factual evidence:

> If the exclusionary rule were extended to sentencing in the ordinary case, its additional deterrent effect would be so minimal as to be insignificant.

The Logan opinion agreed with the Fourth Circuit and declined to make unconstitutionally seized evidence off limits for consideration by a sentencing judge:

19

We agree, and accordingly conclude that usually <u>the stricture of this Supreme Court doctrine does not extend to the sentencing stage of a criminal cause</u>.

289 Md. at 486. (Emphasis supplied.) Constitutional exclusionary rules, federal and state, do not apply to sentencing.

## What Is An Impermissible Consideration?

The only example we have found of evidence relied upon by a sentencing judge which was on appellate review found to have been an impermissible consideration was in the opinion of the Court of Appeals in <u>Johnson v. State</u>, 274 Md. 536, 336 A.2d 113 (1975). The appellant was there convicted of burglary and sentenced to twelve years of incarceration. At the very outset of the opinion, Judge Digges identified the single issue before the court:

> The scope of this Court's review, as directed in the writ, is limited solely to <u>the question of whether the trial court denied Johnson due process by sentencing him to a longer term based upon his not admitting guilt but instead pleading not guilty</u> and testifying in his own behalf.

274 Md. at 537. (Emphasis supplied.)

The Court was concerned that the sentencing judge may have been influenced by an improper consideration:

> Although we cannot be sure to what extent it actually affected the judge's ultimate determination, if at all, we think that <u>certain remarks made by the sentencing judge</u>, as they are transcribed in the record, <u>indicate that he may have imposed sentence in this case based upon an impermissible consideration</u>.

274 Md. at 538. (Emphasis supplied.)

In the colloquy which took place between the judge and the defendant at the time of allocution, the words of the judge did indicate that the relative harshness of the sentence

could have been the product of the fact that the defendant had failed to enter a guilty plea and continued, even after his conviction, to protest his innocence:

> And when you sit up here and lie about it, and you're not telling the truth. You think you're trying to get away with it. That attitude is not consistent with any consideration for leniency. If you had come in here after this happened, before the other trouble you got into – if you had come in here with a plea of guilty and been honest about it and said, 'Of course I did it,' which you did, you would probably have gotten a modest sentence, concurrent with the one in the District of Columbia, and you would have gotten out of it. But with this attitude that you have you can't receive that kind of treatment.

274 Md. at 539-40. (Emphasis supplied.)

The assertion by the defendant of a constitutional right was not, the Court held, good cause for the imposition of a harsher punishment:

> [A] consideration of Johnson's failure to plead guilty was impermissible because a price may not be exacted nor a penalty imposed for exercising the fundamental and constitutional right of requiring the State to prove, at trial, the guilt of the petitioner as charged. This is as unallowable a circumstance as would be the imposition of a more severe penalty because a defendant asserted his right to counsel or insisted on a jury rather than a court trial.

274 Md. at 543. (Emphasis supplied.) The sentence was vacated and the case was remanded for resentencing. In the present case, by contrast, there was no impermissible consideration of this variety.

## What Is Reliability?

The one consistent limitation on what a sentencing judge may consider is the requirement that the evidence being considered by the sentencing judge must be reliable. To be reliable, however, is not necessarily to be credited – by anyone in particular. To be reliable is simply to be believable. Not necessarily believed, just believable. Reliability requires that the evidence be legally competent to be credited. One juror may credit the

21

evidence while another does not. A jury may credit the evidence even if the judge does not. Conversely, a judge may credit the evidence even if it might seem that the jury did not. Evidence may be credible in the last analysis even if nobody credits it.

## The Sentencing Procedure In This Case

The challenged consideration at his sentencing to which the appellant takes umbrage is Judge Coleman's concern that the appellant pointed the shotgun at Deputy Merle's face or head. That, of course, was reliable evidence. It was based on the direct trial testimony of a competent witness. It bore directly, moreover, on the behavior of the appellant during a critical moment of the crime of which he was convicted. In our review of the entire history of sentencing law in Maryland, there is no criterion by which this crucial piece of evidence could be deemed to be an impermissible or improper consideration. We reject the appellant's first contention.

## The Grammatical Sin Of The Compound Question

The appellant's second contention raises up the dread specter of the compound question in the danger-rife arena of voir dire examination. Since Dingle v. State, 361 Md. 1, 759 A.2d 819 in 2000, as explicated by Pearson v. State, 437 Md. 350, 86 A.3d 1232 in 2014, it has been treacherous to pose a compound question to a prospective juror under certain ominous circumstances.

The appellant contends that reversible error occurred when a forbidden compound inquiry was posed to the panel of prospective jurors in this case. He actually contends that this forbidden questioning repeated itself on no less than five occasions. Our first effort to

cope with that five-headed Hydra will be to reduce it to a single contention and to let that serve as representative of the other four. If even one of the forbidden questions should not have been asked, that one misstep will be fatal enough. The conviction will be reversed and the appellant will have prevailed. If, on the other hand, the representative challenge may have been repelled or forfended, by some such procedural blockage as non-preservation, that impediment may serve to blunt all five prongs and the State will prevail. Whether they might have been winners or losers, the four duplicate contentions will be moot.

## Some Syntactical Homework

Before further analysis can proceed, however, a bit of syntactical homework is in order. Our assignment in this regard will be found in the dissenting opinion of Judge Raker in Dingle v. State, at 361 Md. 27 n.6. As Judge Raker instructs, the initial lesson is to "use the proper syntactical designations for the two parts of the compound question." Use precise vocabulary!

A compound question, in this Dingle-Pearson analysis, consists of two parts which are very different in their basic nature and function. The first part is the "protasis" or the "conditional clause." It addresses the "potential existence of a specified condition." The second part addresses "the potential effect of the specified condition," if that condition exists. That second or consequential part is the "apodosis," or the "conclusion clause." The apodoses tend to "remain constant," always yielding a simple "Yes" or "No." The protases, by contrast, are widely variable, "relative to each particular experience or association of concern." It is the protasis that identifies the actual condition that might represent a

23

challenge for cause. The apodosis represents only what the prospective juror believes would be his or her response to such a condition. With this syntactical homework under our belt, we may proceed.

## The Basic Purpose Of <u>Voir Dire</u>

At the very outset of his opinion for the Court of Appeals in <u>Dingle v. State</u>, 351 Md. at 9, Chief Judge Bell set out the fundamental purpose of the <u>voir dire</u> examination:

> <u>Voir dire</u>, the process by which prospective jurors are examined to determine whether cause for disqualification exists, <u>is the mechanism whereby the right to a fair and impartial jury</u>, guaranteed by Art. 21 of the Maryland Declaration of Rights, <u>is given substance</u>. <u>The overarching purpose of voir dire in a criminal case is to ensure a fair and impartial jury</u>.

(Internal citations omitted.) (Emphasis supplied.)

The question-and-answer process of the <u>voir dire</u> examination is aimed at developing information about prospective jurors that will help the parties – defense counsel, the prosecutor, and the trial judge – to cull out unacceptable jurors. The culling out process may take either of two different forms. At the more grievous end of the scale, either defense counsel or the State might believe that a particular prospective juror is so disqualified that that juror should be struck for cause. Counsel would make the appropriate motion and the trial judge would then be required to make a ruling in that regard.

At the less grievous end of the scale, counsel for either the defendant or the State would be entitled to strike the prospective juror by way of a peremptory challenge. Maryland has always employed a very limited form of <u>voir dire</u> examination, one that seeks from a prospective juror being examined only information that might go to establish a challenge for cause. In Maryland, the entire <u>voir dire</u> examination process is configured so

24

as to facilitate and effectuate the more severe of the two culling-out techniques – the challenge for cause. The forbidding of the compound question is designed to protect the free flow of information necessary to effect a proper challenge for cause. Any effect that rule might have on peremptory challenges is completely coincidental.

A significant majority of states, by contrast, employ a broader and more sweeping form of voir dire examination, one that develops background information about a prospective juror that could assist the defense or the State in exercising peremptory challenges more intelligently. In Pearson v. State, 437 Md. at 356-57, Justice Watts described the more limited aim of the voir dire examination in Maryland:

> Maryland employs limited voir dire. That is, in Maryland, the sole purpose of voir dire is to ensure a fair and impartial jury by determining the existence of specific cause for disqualification. Unlike many other jurisdictions, facilitating the intelligent exercise of peremptory challenges is not a purpose of voir dire in Maryland. Thus, a trial court need not ask a voir dire question that is not directed at a specific cause for disqualification or is merely fishing for information to assist in the exercise of peremptory challenges. On request, a trial court must ask a voir dire question if and only if the voir dire question is reasonably likely to reveal specific cause for disqualification.

(Internal citations omitted.) (Emphasis supplied.)[2]

**What Mysteries May Lie Hidden Beneath A Compound Question?**

It is only recently – since Dingle v. State, in 2000 – that Maryland has cast a critical eye at the use of a compound question in the voir dire examination process. The simple

---

[2] See the line of cases that runs consistently from Handy v. State, 101 Md. 39, 43, 60 A. 452 in 1905 through its well-considered and express reaffirmation in Whittemore v. State, 151 Md. 309, 315-16, 134 A. 322 in 1926 to its definitive culmination in Davis v. State, 333 Md. 27, 39-43, 633 A.2d 867 in 1993, affirming the decision of this Court in Davis v. State, 93 Md. App. 89, 94, 611 A.2d 1008 (1992).

question, by contrast, has never posed a problem. A party asks a question. A prospective juror answers it. The questioner processes the answer for whatever it is worth. With Dingle, however, there dawned an awareness that a compound question might not facilitate an answer but might obscure it. The compound question thus exposed itself to some probing grammatical analysis. Instead of facilitating the free flow of information, the compound question, we learned, was sometimes an actual impediment to the free flow of information.

In the Dingle-Pearson context, a compound question is, of course, a two-part question, consisting, in Judge Raker's syntactical terms, of a protasis and an apodosis. The first of the two parts – the protasis – describes some condition or experience or existing attribute in the background or make-up of the prospective juror. The second of the two parts – the apodosis – describes the possible impact or influence that the protasis may have on the ability of the prospective jurors to be a fair and impartial juror. Knowledge about the protasis could thus well be vital for the selection of a fair and impartial jury. Such knowledge could readily lead to an actual challenge for cause. Such knowledge, moreover, could obligate the trial judge to make a ruling with respect to such a challenge. A simple question would also provide information about the protasis. It could lead, of course, to follow-up questions.

An answer to a compound question, on the other hand, could sometimes leave us completely in the dark about the protasis. We might never know whether a valid challenge for cause potentially existed or not. The trial judge, moreover, might never be called upon to make a required ruling in that regard. We would have to rely upon the juror himself to

answer that critical question. Chief Judge Bell described the compound question put to the jury in <u>Dingle v. State</u>:

> While the court agreed to, and <u>did, make the inquiries the petitioner requested, it did so by joining with each of the petitioner's requested inquiries, one suggested by the State, namely an inquiry into whether the experience or association posited would affect the prospective juror's ability to be fair and impartial.</u> <u>Thus, the inquiry</u> the court conducted to satisfy the petitioner's concerns <u>consisted of a series of two part questions, the answers to which</u>, the court instructed, <u>need not be revealed unless a member of the venire panel answered both parts in the affirmative</u>.

361 Md. at 3-4. (Emphasis supplied.) The compound question in this case was accompanied by the following direction:

> <u>You should only stand if your answer is yes to both parts of the question. If your answer is no to either part of the question, then you should not stand</u>. So once again, <u>only stand if your answer is yes to both parts of the question</u>.

361 Md. at 5. (Emphasis supplied.)

It is the negative answer, the non-response, that is the problem. A negative answer to the apodosis, signified only by the juror's continuing to sit silent, tells us nothing. What does, "No, I can be impartial" mean? Does it mean, "No. Notwithstanding the existence of the circumstance you ask about, I can overcome that and still be fair and impartial?" Or does it mean, "No, I can be impartial because the circumstances you asked about do not even exist in my case and there is no reason, therefore, why I cannot be fair and impartial?" The unspoken answer to the apodosis will be "No" regardless of whether the unspoken answer to the protasis would have been "Yes" or "No." Even in the face of a tentative challenge for cause, it would have been the prospective juror himself rather than the trial judge who made the ultimate decision as to whether a challenge for cause existed.

27

Several general observations about compound questions are appropriate. Our interest is almost entirely in the protasis, not in the apodosis. One apodosis is essentially like all the other apodoses. It is a common denominator response, an essentially verbatim replicate of every other apodosis. The unique personality and identity of a particular compound question lies in the protasis. It is there that one must look to determine whether there is good cause to challenge a juror's qualifications.

One other general observation is in order. A compound question is not a self-contained sin unto itself. Its sinful nature does not inhere in its very grammatical structure. Only compound questions that are answered in the negative give rise to appellate challenges. A compound question that is answered in the affirmative is completely innocuous. It leaves no mystery as to the answer to the protasis. The answer, "Yes. I cannot be fair and impartial" tells us that the answer to the protasis was necessarily also, "Yes." The suspect condition exists. Otherwise, there would have existed no reason why the prospective juror could not be fair and impartial.

The negative answer to the apodosis is doubly bad. If good cause exists for a prospective juror to be excused for cause, a defendant is entitled to have a trial judge make a considered ruling in that regard. The ambiguous response of "No" to the apodosis may well mean, and frequently does, that the prospective juror has made his own self-serving ruling as to his qualification and has taken unto himself the judicial responsibility in that regard. In <u>Dingle v. State</u>, <u>supra</u>, the Court of Appeals spoke in that regard:

> <u>The trial judge's mistake was that he failed to appreciate that, should there be a challenge, he had the responsibility to decide</u>, based upon the circumstances then existing, *i.e.* 'in addition to the venire person's bottom line conclusion in that regard,

28

as reflected in the answers he or she gives, <u>the character and duration of the position, the venire person's demeanor and any and all other relevant circumstances,' or, in other words, whether any of the venire persons occupying the questioned status or having the questioned experiences should be discharged for cause</u>, or whether a demonstrably strong correlation exists between the status or experience in question and a mental state that gives rise to cause for disqualification. <u>Because he did not require an answer to be given to the question as to the existence of the status or experience unless accompanied by a statement of partiality, the trial judge was precluded from discharging his responsibility</u>, *i.e.* exercising discretion, and, at the same time, the petitioner was denied the opportunity to discover and challenge venire persons who might be biased.

361 Md. at 17. (Emphasis supplied.) The defendant is entitled to have the trial judge make the decision as to whether a challenge for cause exists. The trial judge is not required, nay not permitted, to accept the prospective juror's self-appraisal in that regard.

## Two General Rules

Our analysis of the compound question in <u>voir dire</u> examinations yields two related general rules, which should be read in combination. They are:

1. **A compound question will only be prejudicial when the answer to the compound question is in the negative.**

2. **Even a compound question answered in the negative will be prejudicial only when the answer to its protasis would have produced a challenge for cause.**

Even a compound question that produces a negative response (including a negative response by silence) and therefore obscures the answer to the protasis will not necessarily produce a reversible error. It is further required that we look closely at the protasis. If it concerns a subject matter that goes directly to a challenge for cause, the compound question would produce a prejudicial error. A necessary answer would have been obscured. The trial judge, moreover, would have failed to make a necessary decision.

29

If, on the other hand, the subject matter of the protasis would not have exposed a challenge for cause but would only have produced information that might be helpful in the intelligent use of a preemptory challenge, the obscuring of that information would not have produced a prejudicial error. Producing such information has never been the purpose of the more limited form of voir dire examination in this state. Even a simple one-part question aimed at developing such information is not required by Maryland law. If the subject matter of the protasis, therefore, does not go to a challenge for cause, a compound question that obscures the answer will not amount to prejudicial error. It is simply immaterial.

In Pearson v. State, supra, Justice Watts explained the reason behind the critical distinction, stating at 437 Md. 357-58:

> On request, a trial court must ask during *voir dire* whether any prospective juror has had an experience, status, association, or affiliation if, and only if the experience, status, association, or affiliation has a demonstrably strong correlation with a mental state that gives rise to specific cause for disqualification. For example, in Yopps v. State, 234 Md. 216, 221, 198 A.2d 264, 267, a burglary case, this Court held that the trial court did not abuse its discretion in declining to ask during *voir dire* whether any prospective juror or anyone in any prospective juror's family had ever been the victim of a burglary. This Court stated that the proposed *voir dire* question did not relate to a specific cause for disqualification.

(Emphasis supplied.)

In Perry v. State, 344 Md. 204, 686 A.2d 274 (1996), a murder case, the Court of Appeals held that the trial court had not abused its discretion in declining to ask during voir dire whether any prospective juror, anyone in any prospective juror's family, or any prospective juror's "close personal friend" had ever been "a juror, witness, victim, or defendant in any criminal proceeding." In Perry, the Court explained, 344 Md. at 218:

30

> A prospective juror's having had prior experience as a juror, witness, victim, or defendant in a criminal proceeding of any kind, or in one involving a crime of violence, is not *per se* disqualifying. It is even less tenable to argue that a prospective juror is disqualified simply because of the experience of a member of the prospective juror's family or on the part of a close personal friend.

(Emphasis supplied.) *See also* Yopps v. State, 234 Md. 216, 221, 198 A.2d 264 (1964).

## A Representative Example

In this case, five challenges may conveniently be reduced to one. The first of the five challenged compound questions turns out to be a worthy representative of the forbidden compound question generally. It was:

> Do any of you have such a close association with a law enforcement officer or organization that it would in any way impair your ability to be fair and impartial?

The State properly concedes that this was a forbidden compound question:

> Robson is correct that, pursuant to Dingle and its progeny, the question was asked in an improper manner. The compound form of the question is precisely the same as in Dingle and a "law enforcement" question was mandatory in this case.

(Emphasis supplied.)

The question about close association with law enforcement officers was, indeed, mandatory in this case. The only two witnesses for the State were deputy sheriffs for Howard County. Whereas a question about close association with law enforcement is not always mandatory, it was in this case. Pearson v. State, 437 Md. 350, 369, 86 A.3d 1232 (2014) ("[W]here all of the State's witnesses are members of law enforcement agencies and/or where the basis for a conviction is reasonably likely to be the testimony of members of law enforcement agencies, on request, a trial court must ask during voir dire, 'Have any of you ever been a member of a law enforcement agency?'")

31

In this case, the protasis inquired about a subject that could have established a valid challenge for cause. Prospective jurors, by their failure to respond, answered that question in the negative. The parties and the trial judge never knew, with respect to any prospective juror, whether the protasis was true or not. In any case that might have led to a challenge for cause, therefore, the trial judge never got to make a ruling. The only decision about a challenge for cause, if such a decision was ever made, was made by the prospective juror himself and not by the trial judge. Properly preserved, this would have been reversible error per se.

On the merits of the compound question issue, multiplying the error, even by five, would have made no difference in the outcome of the case whatsoever. If, moreover, consideration of the merits of this issue had been foreclosed by some such procedural impediment as non-preservation, the same procedural impediment would have barred consideration of the other four examples of a compound question as well. In a word, the other four are moot. In this case, non-preservation carries the day. The representative objection was not preserved. None of the other four possible objections have been preserved either.

## Non-Preservation Squared

As Maryland Rule 8-131(a) makes unambiguously clear, the appellate courts of this state "ordinarily will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Small v. State, 235 Md. App. 648, 696, 180 A.3d 163 (2018). To preserve successfully for appeal "any claim involving a trial court's decision about whether to propound a voir dire question, a defendant must object

to the court's ruling." <u>Foster v. State</u>, 247 Md. App. 642, 647, 239 A.3d 741 (2020), <u>cert. denied</u> 475 Md. 687, 257 A.3d 1156 (2021). *See also* <u>Smith v. State</u>, 218 Md. App. 689, 700-01, 98 A.3d 444 (2014) ("An appellant preserves the issue of omitted <u>voir dire</u> questions…by telling the trial court that he or she objects to his or her proposed questions not being asked.").

To neither the representative compound question now being considered nor to any of the five allegedly compound questions which the appellant challenges was there raised so much as a murmur of objection during the <u>voir dire</u> examination. Prior to the commencement of the trial, both the appellant and the State submitted proposed <u>voir dire</u> questions to the trial court. Each question to which the appellant now objects was originally proposed verbatim by the appellant himself. Immediately before the trial began, counsel for the appellant and for the State engaged in a discussion with the trial judge in chambers regarding the <u>voir dire</u>. Upon returning to the courtroom, counsel for the appellant placed no objection on the record about the <u>voir dire</u> questions. As the <u>voir dire</u> then proceeded, the judge posed to the jury each of the questions that had been proposed by the appellant. After the <u>voir dire</u> examination was concluded, the court at a brief bench conference asked whether counsel was "satisfied with its questions?" Appellant's counsel answered unequivocally, "I'm satisfied with the questions that have been asked, yes." That was more than mere silence.

### The Prime Purpose Of The Preservation Requirement

The preservation issue in this case, however, is a provocative one. That might seem strange to say because the case against preservation here is so extreme as virtually to

33

answer itself. The answer is easy. (As if getting the right answer is all that matters. It is not.) The case is provocative because the very extreme nature of its circumstances should prompt us to stand far back and then to revisit (or perhaps to visit for the first time) the fundamental question of why we even have a preservation requirement. What is the preservation requirement supposed to accomplish? We are routinely obsessed with the question, "What does the preservation obligation require?" We need to pause occasionally and ask, "Why does it do so?"

The purpose of the preservation requirement is to preserve the integrity and the efficiency of the trial itself. Its primary purpose is not to facilitate or to foreclose appellate review of a trial error. That is only a collateral consequence. Its primary purpose is to eliminate any necessity for appellate review.

In common law jurisprudence, a trial, civil or criminal, can be a devilishly complicated operation that can easily go off the tracks. The job of keeping that trial on the tracks is not solely the responsibility of the trial judge, <u>sua sponte</u>. Sharing the awesome responsibility with the trial judge are the legally trained counsel of both parties to the trial. It is the clear responsibility of counsel to share with the trial judge the obligation to keep the trial on the tracks. Although the ruling that may ultimately be erroneous is that of the judge himself, it is the unmistakable obligation of counsel to alert the judge that the chance of error is dangerously looming. It is the generative philosophy of the preservation requirement that the judge, then alerted and with the assistance of counsel, will promptly make a correction of course so that the threatened error never occurs.

The purpose of the preservation requirement is not primarily to limit the review of error on appeal but to prevent that error from ever occurring in the first place. If the trial goes off the tracks, responsibility lies not on the judge/engineer alone but also on the counsel who failed to alert the judge that danger lay ahead. Non-preservation's limiting of appellate review is simply collateral damage, although that is where we most commonly encounter it. The preservation rule's prime and generative purpose is to avoid error in the first place and thereby to preclude the very necessity for appellate review.

Had counsel alerted the judge to the nuanced prohibitions of <u>Dingle</u> and <u>Pearson</u>, there is every expectation that the judge, with the assistance and concurrence of counsel, would promptly have remedied whatever defect needed remedying and that no error would have occurred. This is the very reason why the preservation requirement even exists. A secondary purpose of the preservation requirement is to protect the trial judge from being charged with error without having been alerted to the risk by counsel.

In this case a lion's share of blame for the forbidden compound question was born by defense counsel. The <u>voir dire</u> question now in issue was written out by appellant's counsel and handed to the court who then asked that question in the precise terms in which the appellant had requested it. The very first of the proposed <u>voir dire</u> questions which the appellant requested the court to ask the prospective jurors was:

> Do any of you have such a close association with a law enforcement officer or organization that it would in any way impair your ability to be fair and impartial?

That was verbatim the precise question that, at the appellant's request, was put to the prospective jurors. Far from simply not alerting the judge that the danger of trial error

35

lay ahead, counsel was actually an accessory before the fact to the very error of which he now complains. Ordinarily, a case of non-preservation may consist of nothing more than a purely negative failure to object. It may represent nothing more than inadvertence. Here we have, by contrast, an actual express and affirmative waiver of any possible objection. This is non-preservation of a very different order. There are, indeed, different levels or layers of non-preservation. This is not a case of mere inadvertent non-preservation. It is a case of non-preservation squared.

## The Invited Error Doctrine

In terms of the preservation issue, the case was a classic instance of what the Court of Appeals in State v. Rich, 415 Md. 567, 575, 3 A.3d 1210 (2010) referred to as "invited error":

> [B]ecause the manslaughter instruction was specifically requested by Respondent's trial counsel, the doctrine of invited error is applicable to his argument that "the instructional error materially affected his right to a fair and impartial trial." The "invited error" doctrine is a shorthand term for the concept that a defendant who himself invites or creates error cannot obtain a benefit – mistrial or reversal – from that error. The doctrine stems from the common sense view that where a party invites the trial court to commit error, he cannot later cry foul on appeal.

(Internal citations omitted.) (Emphasis supplied.) *See also* Klauenberg v. State, 355 Md. 528, 544, 735 A.2d 1061 (1999) ("Because appellant invited the error of this testimony and did not object to the answer given by Ruter, this issue also is waived." (Emphasis supplied.))

This Court has also dealt with the issue of "invited error" in the opinion of Judge Motz for the Court in Allen v. State, 89 Md. App. 25, 43, 597 A.2d 489 (1991), cert. denied 325 Md. 396, 601 A.2d 129 (1992):

First, we note that <u>all evidence</u> in the record <u>indicates that David deliberately</u> <u>behaved in a manner that led to the alleged jury taint</u>. For this reason, <u>the widely</u> <u>cited "invited error" doctrine may, in and of itself, provide grounds for denial of</u> <u>David's motion for mistrial</u>. "Invited error" is the shorthand term for the concept <u>that a defendant who himself invites or creates error cannot obtain a benefit</u> – mistrial or reversal – <u>from that error</u>.

(Emphasis supplied.) Any issue with respect to this "invited error" is, therefore, not properly before us for appellate review.

## Ineffective Assistance Of Counsel

This second contention, however, continues stubbornly to wriggle. Recognizing the inherent frailty of his preservation argument, the appellant veers off down a tangent off of a tangent – the ineffective assistance of counsel based on counsel's non-preservation of the original issue. From the ineffective assistance of counsel tangent off the non-preservation tangent, it's a long way back to the actual demerits of the compound question.

In <u>Johnson v. State</u>, 292 Md. 405, 434-35, 439 A.2d 542 (1982), Judge Digges referred to Maryland's long-standing practice of preferring a post-conviction proceeding in the trial court to an appeal as the far better way resolving claims of inadequacy of counsel. He explained in detail Maryland's reasons for this strong preference:

> [I]t is because the trial record does not ordinarily illuminate the basis for the challenged acts or omissions of counsel, that <u>a claim of ineffective assistance is</u> <u>more appropriately made in a post-conviction proceeding</u>. [U]nder the settled rules of appellate procedure, <u>a claim of ineffective assistance of counsel not presented to</u> <u>the trial court generally is not an issue which will be reviewed initially on direct</u> <u>appeal, although competency of counsel may be raised for the first time at a section</u> <u>645A post-conviction proceeding. Upon such a collateral attack, there is presented</u> <u>an opportunity for taking testimony, receiving evidence, and making factual</u> <u>findings concerning the allegations of counsel's incompetence.</u> By having counsel testify and describe his or her reasons for acting or failing to act in the manner complained of, the post-conviction court is better able to determine intelligently

37

whether the attorney's actions met the applicable standard of competence. Where, as here, the record sheds no light on why counsel acted as he did, direct review by this Court would primarily involve the perilous process of second-guessing perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions. Consequently, <u>we leave consideration of Johnson's ineffective representation claim to the circuit court upon post-conviction proceedings where there can be a studied evaluation of a proper record should appellant choose to pursue the matter</u>.

(Internal citations omitted.) (Emphasis supplied.)

Judge Battaglia spoke to a similar effect in <u>Mosley v. State</u>, 378 Md. 548, 558-61,

836 A.2d 678 (2003):

We have explained on numerous occasions that <u>a post-conviction proceeding</u> pursuant to the Maryland Uniform Post Conviction Procedure Act, Maryland Code, Section 7-102 of the Criminal Procedure Article (2001<u>), is the most appropriate way to raise the claim of ineffective assistance of counsel</u>. The Act allows the convicted person to attack the judgment collaterally by challenging the legality of the conviction and incarceration in a separate evidentiary proceeding.

(Emphasis supplied.)

<u>Mosley v. State</u> went on to explain fully why the post-conviction proceeding was a

decidedly better quorum for reviewing the adequacy of counsel issue:

When a defendant attacks a criminal judgment on the basis of denial of effective assistance of counsel, the Act thus provides the defendant with the possibility of an evidentiary hearing, reflecting a recognition that <u>adequate procedures exist at the trial level, as distinguished from the appellate level, for taking testimony, receiving evidence, and making factual findings thereon concerning the allegations of error. Post-conviction proceedings are preferred with respect to ineffective assistance of counsel claims because the trial record rarely reveals why counsel acted or omitted to act</u>, and such proceedings allow for fact-finding and the introduction of testimony and evidence directly related to allegations of the counsel's ineffectiveness.

<u>Id.</u> (Emphasis supplied.) (Internal citations omitted.) The opinion concludes:

[T]he adversarial process found in a post-conviction proceeding generally is the preferable method in order to evaluate counsel's performance, as it reveals facts, evidence, and testimony <u>that may be unavailable to an appellate court using only the original trial record</u>.

38

Id. (Emphasis supplied.) (Internal citations omitted.)

More recently the Court of Appeals reaffirmed this long-standing preference for the post-conviction proceeding as the preferable forum. Judge (later Chief Judge) Getty wrote for the Court in Bailey v. State, 464 Md. 685, 704, 212 A.3d 912 (2019):

> This Court determined that the adversarial process found in a post-conviction proceeding generally is the preferable method when evaluating an ineffective assistance of counsel claim.

(Emphasis supplied.) *See also* Ware v. State, 360 Md. 650, 706, 759 A.2d 764 (2000); Addison v. State, 191 Md. App. 159, 174, 990 A.2d 614 (2010) ("The Court of Appeals has repeatedly stated that the 'desirable procedure' for presenting claims of ineffective assistance of counsel is through post-conviction proceedings.").

We fully agree that this tangent upon a tangent issue can be, if the appellant opts to raise it again, better resolved on post-conviction review. This concludes our consideration of the appellant's second contention.

## A Shotgun In The Jury Room?

The appellant's third and final contention will not detain us long. Just as this case was set to go to the jury, the focus turned to the shotgun:

> [DEFENSE COUNSEL]: …Your Honor, it has been brought to my attention that the sheriffs have some concerns about the firearm that is admitted into evidence as State's Exhibit 1. It is not going to be back with the jury during deliberations…I think that this is a piece of evidence that is part of the record. It's been manipulated and handled in court all day. And it should be back there with them as they are deliberating. I don't see any inherent danger…It is not a mechanism that can fire without any ammunition. So I would ask that it be brought back to the jury along with the other exhibits excepting State's 2, which is the ammunition.

(Emphasis supplied.)

Judge Coleman, however, unequivocally ordered that the shotgun would not be permitted to be taken into the jury room. The appellant appeals that order. The question of what, if any, items may be taken into the jury room during deliberation is governed by Maryland Rule 4-326(b), which provides:

> **Items taken to the jury room.** Jurors may take their notes with them when they retire for deliberation. <u>Unless the court for good cause orders otherwise, the jury may</u> also <u>take the</u> charging document and <u>exhibits which have been admitted into evidence</u>, except that a deposition may not be taken into the jury room without the agreement of all parties and the consent of the court.

(Emphasis supplied.)

As we focus in more tightly on Rule 4-326(b), two of its provisions are pivotal to the present appeal. On the permissive side of the ledger, the rule provides that "the jury may…take…exhibits which have been admitted into evidence." The shotgun, to be sure, was admitted into evidence as State's Exhibit No. 1. As an exhibit which had been admitted into evidence, the shotgun would presumptively go to the jury room. Thus far, the appellant's argument is on course.

The rule's second pivotal provision, however, is the limitation on an item's being permitted to go to the jury room: "Unless the court for good cause orders otherwise." In this case, Judge Coleman did resoundingly "order otherwise." The appellant's appeal challenges Judge Coleman's order, claiming that there was no "good cause" for such an order.

On this contention concerning the shotgun, the appellant relies exclusively on the opinion of the Court of Appeals in Adams v. State, 415 Md. 585, 4 A.3d 499 (2010). The item there in issue in terms of whether it should have been admitted to the jury room was

40

a police videotape of an undercover drug transaction. The Court held that it was error in that case not to have permitted that videotape to be taken into the jury room.

We fully agree that the opinion of Chief Judge Bell in <u>Adams</u> completely controls the present issue. It fully supports, however, the position taken by the State in the present case. The propriety of the exclusion of an admitted exhibit from the jury room is, to be sure, fully contingent on the exhibit's having been ordered for good cause by the trial judge not to be taken into the jury room. In <u>Adams</u> no such good cause order was timely made by the trial judge and that was the reason why the exclusion in that case was in error. In this case, by diametric contrast, Judge Coleman unequivocally issued such a good cause order and <u>Adams v. State</u> was fully satisfied. In <u>Adams</u>, 415 Md. at 598, Chief Judge Bell's opinion explained:

> <u>To have been excluded from jury consideration during deliberations, the videotape would have had to be excluded for good cause, prior to the evidence being given to the jury</u>. The <u>record does not reveal any discussion of the need to exclude any exhibits and there certainly is not an order, express or implied, to that effect. So far as the record is concerned, no good cause existed for excluding the videotape</u> and, in fact, just the opposite, the videotape was expected to accompany the jury as it retired to deliberate and to remain with it in the jury room during those deliberations.

(Emphasis supplied.)

In <u>Adams</u> no such good cause order to prohibit the videotape from being taken in the jury room existed:

> <u>We construe Rule 4-326(b) as meaning precisely what it says</u>: that, <u>unless the court for good cause orders otherwise, exhibits admitted into evidence may be taken to the jury room</u> by the jury while it deliberates. For the Rule to have meaning apart from section (c), <u>the "good cause" order must relate to specific exhibits and be made as to it or them prior to the jury being excused to deliberate</u>. Applying this Rule to the instant case, at the very least, <u>the trial judge had to have issued a "good cause"</u>

41

order excluding the subject videotape from the evidence that the jury was permitted to take to the jury room as it deliberated. No such order was issued in this case.

415 Md. at 599. (Emphasis supplied.)

The rule established by Adams v State was loud and clear:

No good cause was found, as section (b) of the Rule required, for excluding access by the jury to the videotape for review. The videotape was, as we have explained, an exhibit that had been admitted into evidence; it was not "testimony or other evidence," as contemplated by section (c). Therefore, the trial court erred in treating it as such. Exhibits admitted into evidence may go to the jury room absent some specific reason, *i.e.*, good cause, to exclude them.

415 Md. at 601. (Emphasis supplied.)

By sharp contrast, Judge Coleman's clear order that the shotgun would not be taken into the jury room was made before jury deliberations began. The good cause for the order was juror safety:

THE COURT: Well, the this is the court's ruling. The court has to be concerned with safety. That's first and foremost. And during the period of this trial there was ample opportunities for that firearm to be shown to the jurors. How it was handled. And this Court is not going to allow that firearm to go back there. The jury had ample opportunity to review that firearm. They had ample opportunity to have demonstration from counsel with that firearm in hand. As well Deputy Merle. So therefore this Court on that motion as far as that firearm going back there, it's not going back there. That's the court's ruling.

(Emphasis supplied.)

## Jeopardy Of Life

The ever agile appellant switches his argument from the very existence of a timely order to one contesting the showing of "good cause" for that order. He argues that safety was not a viable concern because the shotgun was unloaded and the ammunition, which

42

had been introduced as a separate exhibit, was not being sent to the jury room. In his brief, the appellant argues:

> While safety was purportedly the "cause" for not sending the shotgun to the jury, it was not "good" cause because there could be no concern if the weapon was unloaded and ammunition did not go back to the jury.

(Emphasis supplied.)

The annals of history are replete, however, with instances of persons having been shot and killed with "unloaded" weapons. It is not unheard of for a renegade shell or cartridge to lurk somehow hidden in the complexity of an ostensibly unloaded weapon. In this case, moreover, a stash of ammunition was at hand in another of the State's exhibits. Could one of those shells have managed its way into the jury room? Could one of the jurors somehow have had a shell or cartridge of his own? Is it an abuse of discretion to guard against even remote possibilities with the precaution, "Better safe than sorry?"

### Jeopardy Of Limb

The good cause for the safety order in this case, moreover, did not need to rest exclusively on the possible presence of a hidden and unexpected shotgun shell. Danger, albeit of a lesser order, lay closer at hand. There was a secondary danger that the shotgun was a heavy and an awkward metal instrument that could easily have hurt any lay juror that it accidentally hit. The adjuration of defense counsel in closing argument to the jurors, perhaps to each and every one of them individually, conjured up just such a possible scene of accidental if not antic mayhem:

> You guys are going to have this back there with you. You can't have the bullets with them but you're going to have it back there. I would recommend that you manipulate

43

> this. Guns are awkward. They have weight to them. They will point in different directions depending on where you're holding them.
>
> Mr. Robson says that he grabs it by the middle and slides down to the stock end. And as you can tell when you grab it, it naturally wants to hang down. What makes more sense? That in the span of an instant as you open the door Mr. Robson could have had the door in his right hand open, the gun in his left hand, instantly switched it over to his shoulder and drawn it on a trained deputy?

(Emphasis supplied.)

The jury was composed of twelve laymen presumably untrained in the handling of heavy and awkward weapons. Yet appellant's counsel enjoined them to take such an instrumentality into the jury room with them and there to wield it, to wave it, to manipulate it, and to brandish it, effectively to demonstrate its inherent awkwardness, "As you can tell when you grab it…I would recommend that you manipulate it." In such a chaotic Marx Brothers or Laurel and Hardy scenario, it is not at all difficult to envision a bloody nose or a swollen jaw. Whether of life or of limb, jeopardy is jeopardy and should be avoided whenever possible.

Far from assisting the appellant's defense, moreover, such a scenario could only have strengthened the State's case of Reckless Endangerment, the only charge of which the appellant was convicted. The manipulation of the shotgun in the jury room might have been of some persuasive value to the appellant but only with respect to the assaultive charges. The appellant, however, was convicted of neither assaultive charge.

The shotgun, in either of its manifestations, remained a dangerous instrumentality which should not have been allowed to place the jurors in jeopardy of life or, alternatively,

in jeopardy of limb. It was a dangerous instrumentality even short of being a lethal weapon. In that lesser capacity, moreover, it did not even need to be loaded.

## A Matter Of Discretion

It is obvious that a plausible case existed for a finding of "good cause" to support Judge Coleman's order that the shotgun was a safety hazard. Even if one could stretch to make a plausible argument negating such "good cause," that would create, at most, the quintessential situation that could, in the trial judge's discretion, go either way. In such equivocal situations, our path is clear.

The appellant argues this issue, however, as if the merits of the "good cause" determination were before us. They are not. Our only concern is with whether the "good cause" determination is one that falls within the discretionary range of the trial judge. It does. As was well articulated in Jackson v. State, 164 Md. App. 679, 725-26, 884 A.2d 694 (2005):

> Appellate courts are highly deferential to a trial judge's discretionary determinations. Even in cases in which the appellate court might have deemed it wiser or fairer to have ruled otherwise, it will not presume to substitute its judgment for that of the trial court except in the rare case in which the trial judge has literally abused his discretion. To rule differently than the appellate court might have ruled is not, *ipso facto*, such abuse.

(Emphasis supplied.)

This concern for the safety of the jurors was quintessentially a judgment call. With respect to such judgment calls, the position of this Court was unequivocally stated in Tate v. State, 176 Md. App. 365, 408, 933 A.2d 447 (2007):

> Appellate courts have long been trained not to interfere with or to "second guess" such judgment calls, unless the trial judge has been guilty of a clear abuse of

45

discretion. <u>The discretion</u> necessarily entrusted to the umpire on the field <u>embraces, by definition, a range of rational decisions</u>. <u>Within that range a trial judge may freely rule in either direction without fear of being overturned</u>.

(Emphasis supplied.)

In ordering that the shotgun would not be taken into the jury room, Judge Coleman did not abuse his discretion. We affirm his order.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 764

September Term, 2022

TODD ARTHUR ROBSON

v.

STATE OF MARYLAND

Ripken,
Albright,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

Concurring Opinion by Albright, J.

Filed: March 8, 2023

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

On appeal, Mr. Robson argues that the circuit court abused its discretion in three ways: (1) by considering, during sentencing, evidence that Mr. Robson pointed a shotgun at Deputy Sheriff Merle's face; (2) by posing compound *voir dire* questions; and (3) by refusing to allow the shotgun to enter the jury room during deliberations. I join the Majority's apt analysis of the first and third issues.

As to the second issue, I part ways simply because, in my view, non-preservation can end the analysis. The defense proposed the questions that Mr. Robson now challenges, the circuit court read them *verbatim*, and there was no objection. Further, as the Majority points out, the defense indicated after *voir dire* that the questioning was satisfactory. In my view, this concludes our task on direct appeal, and I would go no further here. *See* Md. Rule 8-131(a); *Foster v. State*, 247 Md. App. 642, 647-48 (2020). For those reasons, I respectfully concur.